# EXHIBIT 5

Lost IRS Stonehill Boxes 17 and 83

# EXHIBIT 5 (a)

IRS General Index of Stonehill Documents

General Index
For the contents of the boxes for the Stonehill and Brooks cases

1. Boxes 1 and 2 - Agents' reports and working papers } *25-27*

* 2. Boxes 3 through 8 - Special Agent Report exhibits that are not working
papers or exhibits to the Lukban deposition.  See
Annex 5 for a description of the Special Agent
Report exhibits } *47-53*

3. Boxes 9 through 13 - Collateral investigative reports and exhibits that
were not used in the Special Agent Report } *54-60*

4. Boxes 14 through 16, - Manila investigative files and tape recordings } *28-31/42*
   16A and 16 B

5. Boxes 17 and 18 - Washington office files *3—32—35*
   *19-24 =*

6. Boxes 19 through 25 - Witness files *18—24    2 5 missing*

* 7. Boxes 26 through 30 - Lukban documents - Original exhibits for the General } *36-41*
Jose Lukban deposition

8. Boxes 31 through 35 - Reserved for the original and one copy of the exhibits
for General Jose Lukban deposition that remains in the } *36-41*
Department of Justice files

9. Boxes 36 and 37 - Seized documents in the HAR folders and categories *45-46*

10. Box 38 - Microfilm  (Box 3 in CC Vault.)

11. Boxes 39 through 52 - Xerox copies of the microfilm *61-83*

12. Box 53 - Chief Counsel Criminal Tax Division attorney notes and papers *16+17*
for the review of the Stonehill and Brooks cases ~~Manhattan District~~

13. Boxes 54 and 55 - Justice Department attorney files } *13-15*

14. Eleven boxes of records and microfilm borrowed from the Manhattan District
case files for                    Universal New York, Inc. and the collateral } *1-12*
investigation for the Stonehill and Brooks cases.  Boxes are separately
numbered and designated "New York".

15. Two Boxes -                           case NAT 319-OIO, 61-OIO-23-RFI, CC:EN:E-22 *43+44*

16. ~~Two~~ *THREE* Boxes in Chief Counsel's safe

*The original Lukban exhibits 18 through 125 were retained by Mr. Arthur
P─gins, the trial attorney for the Department of Justice, to prepare for

Contents of Box 49 - Volumes 1 through 18 of the Universal New York, Inc. microfilm prints of the correspondence files

Contents of Box 50 - Volumes 19 through 33 of the Universal New York, Inc. microfilm prints of the correspondence files

Contents of Box 51 - Volumes 11 through 29 of the Universal New York, Inc. microfilm prints of the correspondence files

Contents of Box 52 - Volumes 1 through 10 and Volumes 30 through 44 of The Universal New York, Inc. microfilm prints of the correspondence files

Contents of Box 53 - Chief Counsel Criminal Tax Division attorney notes and papers for the review of the Stonehill and Brooks cases in preparation of the Chief Counsel memorandum dated May 20, 1966

002574

# EXHIBIT 5 (b)

May, 20, 1966 IRS Chief Counsel's Memorandum

**U.S. TREASURY DEPARTMENT**
**Internal Revenue Service**
**Washington, D.C.    20224**

CC:E-528, 529;
NA-1039, 1040                                                    MAY 2 0 1966
R:HMH

Honorable Mitchell Rogovin
Assistant Attorney General
Tax Division
Department of Justice
Washington, D. C.    20530

                              In re:  Harry S. Stonehill
                                      Robert P. Brooks
                                      Ira Blaustein
                                      Universal New York, Inc.

Dear Mr. Rogovin:

       The above-mentioned cases are hereby respect-
fully referred to you with the recommendation that
criminal proceedings be instituted against Harry S.
Stonehill for wilful attempted evasion of the taxes
of Universal New York, Inc., for the fiscal years
ended March 31, 1959, March 31, 1960 and March 31,
1961 in violation of Section 7201 of the Internal
Revenue Code; against Ira Blaustein for wilful at-
tempted evasion of the taxes of Universal New York,
Inc., for the fiscal years ended March 31, 1960, and
March 31, 1961 in violation of Section 7201; and
against Stonehill and Blaustein for conspiracy in
violation of 18 U.S.C. 371.  Venue lies in the
Southern Judicial District of New York.  The statute
of limitations with respect to the earliest offense
as to which prosecution has been recommended herein
will not expire prior to July 24, 1966.

       The reports of the examining officers in the
Universal New York, Inc., phase of the case dis-
close civil liabilities, inclusive of penalties,
aggregating $11,061,753.54 for the fiscal years
ended March 31, 1959, March 31, 1960 and March 31,

Box 29-0255

RECEIVED
MAY 24 1966
Director of
International Operations

E-528,529; NA-1039,1040    -2-

1961, whereas the tax liability reported on the returns of Universal New York, Inc., for those years totaled $402.20. A tabulation of the civil liability is set forth on page 5 of the Universal New York, Inc., special agent's report.

In a special agent's report dated July 30, 1965, Revenue Service Representative Sterling Powers recommended prosecution of Harry S. Stonehill and Robert P. Brooks for attempted evasion of their individual income taxes for 1958, 1959, 1960 and 1961 in violation of Section 7201, and for conspiracy, in violation of Title 18, Section 371, naming Stonehill, Brooks, Blaustein, Albert Penet and Doctor E. Michael Meyer as defendants. For the reasons discussed below we do not concur in the recommendations for prosecution as set forth in the July 30, 1965 special agent's report.

Jeopardy assessments have been made with reference to the individual tax liabilities of Stonehill and Brooks and the amounts involved are as follows:

**Stonehill**

| Year | Deficiency | Penalty (Sec. 6653(b)) |
|------|-----------|------------------------|
| 1958 | $ 447,767.77 | $ 223,883.89 |
| 1959 | 2,618,097.21 | 1,309,048.60 |
| 1960 | 2,257,264.90 | 1,128,632.45 |
| 1961 | 2,783,951.86 | 1,393,798.41 |
| Total | $8,107,081.74 | $4,055,363.35 |

Box 29-0256

E-528,529; NA-1039,1040    -3-

Brooks

| Year | Deficiency | Penalty (Sec. 6653(b)) |
|------|-----------|------------------------|
| 1958 | $   204,525.50 | $   102,262.75 |
| 1959 | 1,641,461.92 | 820,730.96 |
| 1960 | 1,963,540.43 | 981,770.22 |
| 1961 | 2,749,461.93 | 1,375,239.89 |
| Total | $6,558,989.78 | $3,280,003.82 |

The above figures are based on net worth
analyses. Cf. pages 103-109 of the Stonehill-
Brooks special agent's report. The tax liability
reported on Stonehill's returns for the years
1958 through 1961 totaled $3,789.16. Brooks re-
ported a total tax liability of $1,026.06 for those
years. Stonehill and Brooks have filed Petitions
in the Tax Court, but the Government has obtained
extensions and has not yet filed answers.

Lien foreclosure actions have been instituted
by the Government with respect to Stonehill in the
Southern District of California, Northern District
of California and in the District of Hawaii. Dis-
covery proceedings (including depositions of agents)
have been instigated by the defense and ordered by
the court in the Southern District of California
action.



4103

In 1964, Stonehill, Blaustein, Kai Hekker,
Universal New York, Inc., and United States Tobacco
Corporation (a Stonehill Philippine corporation)

Box 29-0257

E-528,529; NA-1039,1040    -4-

were indicted for violation of the Bill of Lading
Act.  It is alleged that they falsely represented
that a "Slitter and Rewinder" machine involved in
the manufacture of cigarettes, was a "Thresher
Machine" when they shipped it to the Philippines.
A "Motion to Suppress and Return Property" has
been filed in the bill of lading case in the
Southern District of New York, alleging illegal
search and seizure by the Philippine National
Bureau of Investigation (N.B.I.) in raids in
the Philippines in March 1962, and alleging par-
ticipation of United States agents and agencies.

     Harry S. Stonehill and Robert P. Brooks resided
in the Philippine Islands during the prosecution
years.  Their business activities were worldwide.
They were officers, directors or major stockholders
in some fourteen Philippine corporations and par-
ticipated, to some extent, in the management of
many other Philippine companies.  In the United
States they owned or controlled twelve corporations,
two partnerships and maintained trusts for the
benefit of their families.  There is also evidence
that they owned and controlled Liechtenstein corpora-
tions which were operated principally as bank accounts.
They had an interest in two Hong Kong corporations
and owned an Australian corporation.  Their principal
business was the manufacture and sale of cigarettes
and other tobacco products through the United States
Tobacco Corporation, from which they diverted mil-
lions of dollars to their own use.  This was done
through conversion of Philippine pesos by black
market operations, the transfer of funds to Swiss
accounts and subsequent investment of the funds
in other countries.  (Stonehill-Brooks SAR, pp. 1-2.)

     Harry S. Stonehill, formerly known as Harry
Solomon Steinberg, was born in St. Louis, Missouri,
in September 1917.  He was graduated from the

Box 29-0258

E-528,529; NA-1039,1040    -5-

University of Illinois in 1939, with a degree in
accountancy. He has one daughter by a former
marriage and is presently married to Lourdes Blanco,
a Philippine National. He was arrested on March 3,
1962 by the Philippine authorities on charges in-
cluding bribery, murder, violation of banking laws,
blackmail and tax evasion which resulted in his
deportation from the Philippines on August 3, 1962.
Thereafter, he traveled to Australia, Switzerland
and Brazil. He resided in Mexico City from about
December 1962 until his ouster about June 1963.
He then resided in Vancouver, British Columbia,
Canada, from about June 1963. His application
for permanent Canadian residence was denied in or
about October or November 1964, and he was ordered
to leave Canada by January 9, 1965. He presently
resides in Los Angeles, California.

Robert P. Brooks was born at Manila, Philippines,
on September 12, 1918. He is an American citizen.
His father, Ralph Brooks, was born in Illinois.
His mother, Lucy Trinidad, deceased, was born
in Shanghai, China. Brooks was married to Helen
van Etten in Manila about 1937 and two children
were born of this marriage. He married Pacita
Carrion in Manila on February 22, 1940, and five
children were born of this marriage. During the
war, he was interned by the Japanese. From April
1945 to August 1947 he lived in San Francisco and
San Pedro, California. He has been associated
since about 1950 with Stonehill companies. He
was convicted of bigamy in 1941 but was later
pardoned. He appears to be in good mental and physical
health. He was arrested along with Stonehill on
March 3, 1962 and deported for alleged violations
of Philippine law similar to the charges against
Stonehill. According to our information, he is
presently in Canada.

Box 29-0259

E-528,529; NA-1039,1040    -6-

Ira Blaustein was born in New York City on
August 30, 1918. He has resided with his wife
and three minor children at his home in Westbury,
Long Island, New York. He appears to be in good
mental and physical health. He is a high school
graduate and completed a six-month merchandising
course at New York University.

As you are aware, there are a number of issues
involved in these cases which have been the subject
of recent discussions, memoranda and correspondence.
See our letters dated January 28, 1966, March 10,
1966 and March 15, 1966; "Memorandum of Fact and
Law" dated March 4, 1966 and memorandum from
Mr. McAleer dated March 9, 1966, previously furnished
to your Division. These issues include allegations
in connection with the motion to suppress evidence
in the bill of lading case concerning alleged wire-
tapping by the N.B.I. and alleged participation
by United States personnel; and an alleged illegal
search and seizure by the N.B.I. and alleged partici-
pation by United States personnel. In addition,
the above-mentioned memoranda discuss recent de-
velopments in the Philippines involving the removal
of Col. Jose Lukban as the N.B.I. Director and ad-
verse comments in the press by the new Secretary
of Justice, Jose Yulo, concerning cooperation between
Philippine and United States agencies.

As you also know, there have been recent discussions
between representatives of the Tax Division and the State
Department since at present it does not appear that
Philippine N.B.I. witnesses will be available and the
N.B.I. is not cooperating in connection with obtaining
other Philippine witnesses. We are also awaiting a
decision from another Government agency as to whether
executive privilege is going to be claimed in the
event the defense subpoenas Mr. Joseph McGee.

Box 29-0260

NA-1039, 1040    -7-

Since the above memoranda were written, additional items relating to these matters have been received in your Division. These include a cablegram from Federal Bureau of Investigation Agent Robert B. Hawley concerning his knowledge of the N.B.I. wiretaps; a supplemental memorandum dated March 21, 1966 filed by a defense counsel in the bill of lading case; and a copy of a court opinion regarding the motion to suppress, which will be discussed below. In addition, we have received in this office a memorandum from the Office of International Operations dated March 2, 1966 which encloses a memorandum from Revenue Service Representative Sterling Powers dated February 23, 1966, together with copies of lower court decisions related to the deportation proceedings and the search and seizure. These are enclosed as Chief Counsel's Exhibit 1.

There have been recent comments in Philippine newspapers to the effect that Menhart Spielman is still alive. He is the informant who furnished evidence on which the N.B.I. raids were based, and he is believed murdered. Revenue Service Representative Sterling Powers states that all the indications are that Spielman is dead, but he is investigating the matter.

In a report dated May 28, 1965, Special Agent Herbert Ravett recommended that Universal New York, Inc. (hereinafter referred to as Universal) be prosecuted for wilful attempted evasion of its income taxes for the fiscal years ended March 31, 1959, March 31, 1960 and March 31, 1961; that Harry S. Stonehill and Ira Blaustein be prosecuted for wilful attempted evasion of Universal's income taxes for those fiscal years; and that Ira Blaustein be prosecuted for wilful attempted evasion of his own income taxes for the years 1959 through 1961, all in violation of Section 7201, Internal Revenue Code of 1954.

Box 29-0261

E-528,529; NA-1039,1040    -8-

We do not fully concur with those recommendations.
For reasons discussed below prosecution of Blaustein
for attempted evasion of his individual income taxes
is not recommended.  Prosecution of the corporation
as such is not recommended in view of the Justice
Department policy against this.  We are not recom-
mending prosecution of Blaustein for attempted
evasion of Universal's taxes for the fiscal year
ended March 31, 1959, since the statute of limita-
tions has now expired as to that count.  However,
evidence with reference to Blaustein's attempted
evasion of Universal's taxes for that fiscal year
would be admissible on the issue of intent.  Leeby v.
United States, 192 F.2d 331, 334 (8th Cir. 1951);
United States v. Alper, 260 F.2d 135, 148 (3d Cir.
1958), cert. denied 359 U.S. 906 (1959).  Also,
evidence as to Blaustein's activities in attempting
to evade Universal's income taxes for that year
would be admissible in connection with the conspiracy
count, discussed below.

The statute of limitations has not run with
reference to the attempted evasion by Stonehill of
Universal's taxes for the fiscal year ended March 31,
1959.  This return was filed July 10, 1959 and, other
than occasional visits, the available evidence indi-
cates that Stonehill was continuously outside the United
States until he was arrested in San Antonio, Texas, on
January 4, 1965 in connection with the bill of lading
indictment.

With reference to Blaustein, the statute of limi-
tations for attempted evasion of Universal's income
taxes for the fiscal year ended March 31, 1960 (return
filed July 15, 1960), will expire after August 26,
1966.  (Cf. Universal SAR, pp. 4-5 which states that
Blaustein was absent from the United States 45 days.
This should be 42 days since three trips were in-
volved and the dates of departure should not be
counted.  Rule 45, Federal Rules of Criminal Procedure.)

P. JX 29-0262

Universal maintained its place of business and filed its income tax returns in the Manhattan Internal Revenue District. Accordingly, venue for attempted evasion of Universal's income taxes lies in the Southern Judicial District of New York.

The report of the examining officer with respect to the income tax liability of Universal discloses additional civil liabilities, inclusive of penalties, of $3,552,637.46 for its fiscal year ended March 31, 1959; $4,890,362.25 for its fiscal year ended March 31, 1960; and $2,618,753.63 for its fiscal year ended March 31, 1961, whereas Universal's income tax returns for those years showed a tax liability of $402.20. Civil liabilities of Universal are based on alleged understatements which include alleged unexplained receipts of $3,458,211.39, $4,905,204.44 and $2,880,061.26 for the fiscal years ended March 31, 1959 through March 31, 1961, respectively. According to the special agent, "They represent funds credited on its records to the accounts of various foreign corporations in which Stonehill had a major interest and to accounts in the names of numerous foreign individuals. These funds are unexplained as to source and purpose." (Pp. 5, 14-15, Universal SAR.)

A large portion of the above figures was credited to the account of the United States Tobacco Corporation (a Philippine corporation controlled by Stonehill). An analysis of the United States Tobacco Corporation account on the books of Universal indicates that a large part of these funds was being held by Universal for the purpose of purchasing services, tobacco and supplies on behalf of the United States Tobacco Corporation. (Stonehill-Brooks Exhibits 168-170.)

Also included in the civil liabilities of Universal are items of commission income amounting to $1,041,427.68, $1,203,366.27 and $371,828.53 for the respective fiscal years ended March 31, 1959 through March 31, 1961. The special agent's report

Box 29-0263

E-528,529; NA-1039,1040    -10-

states that these are adjustments made under Section
482 of the Internal Revenue Code.  In this connection,
Universal purchased merchandise for related foreign
corporations from suppliers in the United States.
The merchandise was generally invoiced by Universal
to the foreign corporations at substantially lower
prices than the actual cost to Universal.  The apparent
reason for this was to stay within the terms of a
barter agreement involving tobacco transactions which
Stonehill had with the Philippine government.  Another
apparent reason was to reduce duties in connection
with importing the merchandise into the Philippines.
The result was that Universal charged the foreign
corporations commissions based on the unrealistically
low prices shown by Universal's invoices.

The discussion in the foregoing two paragraphs
sets forth the reason for the large discrepancy in
the Universal civil figures as compared with the
figures for prosecution.  However, the validity of
the civil adjustments has not been evaluated during
our review of the criminal case.

Stonehill was the president of Universal and
owned 55 shares of stock; Blaustein was secretary-
treasurer and general manager and owned 25 shares
of stock; Murray Otstott, Jr., was vice president
and owned 10 shares of stock and Brooks was second
vice president and owned 10 shares of stock.

Universal conducted its operations as an
exporter and importer of general merchandise.
During the years involved, Universal functioned
principally as an agent for numerous Philippine
corporations in which Stonehill had a major interest.
It purchased and sold commodities in the United
States for Stonehill's Philippine corporations

Box 29-0264

E-528,529; NA-1039,1040    -11-

for which Universal earned and received commissions and ocean freight differentials. One of Universal's principal exports was leaf tobacco purchased from suppliers in the United States and exported to Philippine corporations. It also collected proceeds in connection with the sale of Philippine tobacco in the United States (Universal SAR, pp. 6-10).

In connection with the manufacture and sale of cigarettes Stonehill obtained from the Philippine Government an importation monopoly of American Virginia leaf tobacco. This was in the form of a barter agreement which was issued by the No Dollar Import Office (a Philippine Government Agency). Under its terms, the Stonehill controlled Philippine Tobacco Flue Curing and Redrying Corporation (P.T.F.R.C.) was to import into the Philippines 10,000,000 pounds of American tobacco at a price of $4,900,000 (or $.49 a pound) but was required to export 14,000,000 pounds of low grade Philippine tobacco for a total price of $4,900,000 ($.35 a pound). Thus, the project would not affect the dollar reserve of the Philippines.

Stonehill in effect became the exclusive importer of American tobacco, and even his competitors had to obtain their supplies of this tobacco from him. The evidence indicates that to obtain American tobacco, the competitor had to pay the supplier's full price. In addition, the competitor would turn over to Stonehill free of charge 1.4 pounds of Philippine tobacco

Box 29-0265

E-528,529; NA-1039,1040    -12-

for each pound of American tobacco imported.
This 1.4 pounds was in effect Stonehill's mo-
nopoly override.

Blaustein and Stonehill attempted to evade a
substantial portion of Universal's income taxes
by wilfully omitting from its income commissions
earned and received by Universal and ocean freight
differentials paid to Universal.  Universal earned
commissions which were paid to it by the suppliers
of tobacco which Universal purchased to ship to
Philippine corporations.  It also received ocean
freight differentials on tobacco shipped from the
Philippines (the freight being paid by Universal
in the United States).  In addition, it received
ocean freight differentials on tobacco shipped
from the United States.  The normal shipping
rate for tobacco from the United States to the
Philippines was $80 a ton but Blaustein negotiated
a $68 a ton shipping rate.  He then made arrange-
ments with the United States suppliers of this
tobacco to pay the $68 a ton shipping rate to the
shipper and to pay Universal the twelve dollar
per ton difference, which in fact Universal was
paid.

After initially being reflected on Universal's
books as its income, adjusting entries were made
crediting these funds to the Industrial and Business
Management Corporation (I.B.M.C.), a Stonehill
Philippine corporation, and the funds were trans-
mitted to Swiss bank accounts in the names of
nominees for Stonehill.  These funds were not
reflected as income on Universal's tax returns.

Checks for commissions and ocean freight dif-
ferentials which were received during May, June and

Box 29-0266

E-528,529; NA-1039,1040    -13-

July of 1958 were credited to income on the books
of Universal. Later, the total for this three-
month period was transferred by a journal entry
to the credit of I.B.M.C. This was an attempt
to remove it from Universal's income. There are
letters from Blaustein to various suppliers re-
flecting the fact that Universal expected to
receive commissions and ocean freight differentials
for transactions with the suppliers.

Further evidence of fraud consists of a
letter dated October 27, 1958 from Blaustein to
Stonehill, in which Blaustein requested that for
tax purposes Stonehill should send him a back-
dated letter on the letterhead of I.B.M.C. stating
that all commissions earned and received by Uni-
versal and all ocean freight differentials re-
ceived by Universal should be credited on Universal's
books to the account of I.B.M.C. As a result
of Blaustein's letter, a backdated letter from
Stonehill, dated February 3, 1958, was received
by Blaustein sometime in the fall of 1958 making the
above-mentioned request. Thereafter, adjusting
entries were made on Universal's books in an
effort to remove these funds from Universal's
income. Also, Universal transmitted large amounts
of money to a Swiss bank account in the names of
Stonehill's nominees. (Universal SAR, pp. 14-41.)

For its fiscal year ended March 31, 1959
Universal did not report commissions and ocean
freight differentials totaling $58,879.51; for
its fiscal year ended March 31, 1960 it did not
report commissions and ocean freight differentials
totaling $130,185.30; and for its fiscal year ended
March 31, 1961 it did not report commissions and

Box 29-0267

E-528,529; NA-1039,1040    -14-

ocean freight differentials totaling $71,972.26.
(Universal SAR, pp. 14-41.)  Computations showing
tax liabilities based on the understatements are
set forth below.  (Cf. Chief Counsel's Exhibit 2.)

### Taxable Income

| Year | Per Return | Corrected | Increase |
|------|-----------|-----------|----------|
| 3/31/59 | $   261.40 | $ 59,140.91 | $ 58,879.51 |
| 3/31/60 | 1,079.26 | 131,264.56 | 130,185.30 |
| 3/31/61 | (2,259.54) | 69,712.72 | 71,972.26 |
| Totals | ($918.88) | $260,118.19 | $261,037.07 |

### Tax Liability

| Year | Per Return | Corrected | Deficiency |
|------|-----------|-----------|------------|
| 3/31/59 | $ 78.42 | $ 25,253.27 | $ 25,174.85 |
| 3/31/60 | 323.78 | 62,757.57 | 62,433.79 |
| 3/31/61 | | 30,750.61 | 30,750.61 |
| Totals | $402.20 | $118,761.45 | $118,359.25 |

As previously noted, the special agent in the
Universal case recommended that Blaustein be prose-
cuted for attempted evasion of his individual income
taxes for the years 1959, 1960 and 1961 by omitting
his distributive share of the unreported income of
Universal New York, Inc.  (Universal SAR, pp. 41-47,
50.)  The special agent recommended that 25 percent
(the percentage of Universal stock owned by Blaustein)
of the unreported income of Universal be charged
against Blaustein individually as unreported income.

Box 29-0268

(Universal SAR, p. 45.) However, the evidence does not appear to sufficiently show that Blaustein actually received this 25 percent. (Universal SAR, pp. 45-46.) This is illustrated by recent analyses by Revenue Agent William Ragland. (Chief Counsel's Exhibit 3.)

These analyses were based on numerous documents, including handwritten notes, etc., seized by the N.B.I. in the March 3, 1962 raids. The analyses indicate that Blaustein received less than 25 percent in 1959 and more than 25 percent in 1960 and 1961. (Chief Counsel's Exhibit 3,p.1.) However, because of the probable lack of witnesses (discussed elsewhere) to identify and interpret the underlying documents, the Government may not be able to get the revenue agent's analyses into evidence. On balance, it appears that the best approach would be to include Blaustein in the conspiracy count and in the corporate attempted evasion counts and not charge him with attempted evasion of his individual taxes.

Although some of the funds from the commissions and ocean freight differentials were distributed to Robert P. Brooks and Murray Otstott (Chief Counsel's Exhibit 3, pp. 1,3,5) the evidence appears to be insufficient to include them as defendants in the Universal matter. ████████████████████████████████ ██████████████████████████ he is a United States citizen still active in the management of Stonehill's Philippine corporations. If he would talk, he might be a valuable witness.

It appears clear that there is sufficient evidence of wilfulness on the part of Stonehill and Blaustein, with reference to the attempted evasion of Universal's income taxes. This includes the manipulation of Universal's records; the backdated letter; and the transfer of funds to Swiss accounts. (Universal SAR, pp. 48-50.)

There is evidence (most of it inadmissible in view of lack of witnesses from the Philippines and Switzerland) which indicates that the Swiss accounts were personal accounts of Stonehill and Brooks. This evidence shows that in excess of $7,000,000 went into these accounts in addition to the commissions and ocean freight differentials involved in the specific items in the Universal phase of the case; that only $236,452.72

Box 24-0769

X-528,529; NA-1039,1040    -16-

from these accounts was ultimately used for nonpersonal purposes; and that the balance went into personal investments of Stonehill and Brooks. (Stonehill-Brooks SAR, pp. 14-103, 133-222; Chief Counsel's Exhibit 3, pp. 28-29; Workpapers 6, 8 and 9, revenue agent's report dated December 10, 1964.) In this connection, statements of William Saunders, Joe Steinberg and Thelma Bratton refer to funds from the Swiss accounts going into personal investments of Stonehill and Brooks. (Stonehill-Brooks Exhibits 122, 152; and Exhibit 86 to Los Angeles collateral report received May 28, 1963.) Evidence of the personal nature of the Swiss accounts is also in correspondence between Brooks, Stonehill and Doctor E. Michael Mayer and Mr. Albert Penet. (Universal SAR, pp. 44-45; Stonehill-Brooks Exhibits 45, 46, 48, 243, 249 and 259.) However, these exhibits were obtained in the raids and, as of this time, witnesses are not available to establish a foundation for their admissibility.

Defense counsel have taken the position that the commissions and ocean freight differentials were not income to Universal since Universal was merely an agent for the Philippine corporations, functioned as a conduit and was similar to a bank. The answer to these arguments is the evidence showing that under the barter agreement (Universal Ex. 58) Universal was designated as the American supplier of the tobacco; the tobacco companies paid the commissions and ocean freight differentials to Universal; negotiations with the tobacco companies were conducted by Blaustein for the benefit of Universal; and correspondence, etc., with the tobacco companies indicates Universal acted in its own behalf. (Universal SAR, pp. 16-41.) Furthermore, Revenue Agent Vernon Lyden will testify (if the evidence which he studied is not suppressed) that entries concerning the commissions and ocean freight differentials were not on the books and records of I.B.M.C. or the other Stonehill Philippine corporations. In addition, as previously stated, there is evidence that for a period of time (until the backdated letter came into being) the commissions and ocean freight

Box 29-0270

E-528,529; NA-1039,1040 -17-

differentials were carried on the books of
Universal as Universal's income.  (Cf. Uni-
versal SAR, pp. 21-38.)

As previously stated, it is recommended
that Stonehill and Blaustein be prosecuted
for conspiracy, in violation of 18 U.S.C.
371.  It is recommended that the purpose
of the conspiracy be to defraud the United
States by impeding, impairing, obstructing
and defeating the lawful functions of the
Treasury Department in the collection of the
revenue.  United States v. Klein, 247 F.2d
908 (2d Cir. 1957) cert. denied 355 U.S.
924 (1958).  In our opinion, there is pres-
ently admissible evidence, as indicated in
the foregoing discussion and in the Uni-
versal special agent's report, which will
support prosecution of Stonehill and Blaustein
for conspiracy.

As discussed elsewhere in this letter,
Philippine N.B.I. and other witnesses may
not be available so as to make evidence ob-
tained in the raids admissible.  In addition,
as discussed below, it is possible that
evidence from the raids may be suppressed.
For these reasons, we are recommending a
Klein-type conspiracy count as to which
there could be conviction even though these
problems are in the case.

Box 29-0271

E-528,529; NA-1039,1040 -18-

While we think an argument could be made
under Section 6531(1) of the Internal Revenue
Code for a six-year statute of limitations
as to the conspiracy count recommended above,
it appears that an indictment should be ob-
tained within the five-year period provided
in 18 U.S.C. 3282.  Universal's income tax
return for the fiscal year ending March 31,
1961 was signed by Blaustein on June 12,
1961 and received by the District Director
on June 14, 1961.  Thus, considering the
42 days Blaustein was outside the United
States, it is recommended that an indict-
ment be obtained prior to July 24, 1966.

If a motion to suppress is made by
the defense a court may ultimately hold that
the evidence obtained in the 1962 raids
by the N.B.I. should be suppressed.  If
so, items of evidence obtained in these
raids cannot be used in the case.  In
this connection, on April 27, 1966 Judge
Weinfeld rendered an opinion regarding
the motion to suppress in the bill of
lading case.  In that opinion he stated,

Box 29-0272

E-528,529; NA-1039,1040    -19-

"Similarly, while the defense has distorted and exaggerated much of Chandler's testimony, a fair reading of the entire deposition indicates a hearing is required to determine whether Chandler and other government agents participated in the claimed illegal searches to such an extent that they became in effect searches of the Federal Government, even though conducted beyond the territorial limits of the United States." The court further stated, however, that since witnesses involved are in foreign countries, the hearing does not need to be held in advance of trial. The motion was referred to the trial court. (Cf. pp. 47-102 of Memorandum of Fact and Law, supra.)

If there is suppression of the evidence from the raids, it will weaken but not destroy the case. In general, the Universal special agent's report identifies the evidence obtained in the raids. If there is suppression of the evidence, for example, Blaustein's letter to Stonehill (Universal Ex. 46) requesting the backdated letter would not be admissible. However, a copy of the letter was submitted to this office as an enclosure to a letter from Blaustein's attorney dated October 1, 1965. (Included in Chief Counsel's Ex. 4.) Thus, this copy would appear to be admissible.

If there is suppression of the evidence, the testimony of Revenue Agent Lyden to the effect that entries concerning the commissions and ocean freight differentials did not appear on the books of I.B.M.C., would not be admissible since Lyden's testimony is keyed to records obtained in the raids. However, with the available evidence there is a prima facie case, and it would be up to the defense to show that the entries were made on the records of I.B.M.C. Also, the correspondence (Universal SAR, pp. 44-45) tending to show that the Swiss accounts were the personal accounts of Stonehill and Brooks would not be admissible. However, an additional method of establishing that the Swiss accounts were personal, is to show that the expenditures

Box 29-0273

therefrom were personal.  Evidence of this type is available, some of which was not obtained from the raids.  (Cf. Stonehill-Brooks SAR, pp. 76-103.)

If the evidence from the raids is suppressed, in addition to the evidence obtained directly from the raids which could not be used, there is a further problem of whether the evidence to be used was obtained from an independent source.  Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920). In this connection it is noted that the internal revenue agent in the Universal case had started an examination of Universal's return for the fiscal year ended March 31, 1960, prior to the N.B.I. raids on March 3, 1962.  (Universal SAR, p. 3; Universal Ex. 3, p. T-2.)  However, the Universal agents received collateral information and evidence from the Philippine raids during their investigation of Universal.  Although most of the evidence in the Universal case was obtained from United States sources, if the evidence from the raids is suppressed, the defense will undoubtedly raise the "fruit of the poisonous tree" argument.  Cf. Wong Sun v. United States, (371 U.S. 471, 484).  See also McGarry's Inc. v. Rose, 344 F.2d 416 (5th Cir. 1965); Burke v. United States, 328 F.2d 399 (1st Cir. 1964); and McLindon v. United States, 329 F.2d 238 (D.C. Cir. 1963).  However, it appears that (other than the evidence from the raids which could not be used if the evidence is suppressed) the evidence in the Universal case was obtained from independent sources.  Hence, the Government should prevail on this issue.  The issue as to whether the evidence should be suppressed is currently being litigated in the bill of lading case.

Various defenses were presented by counsel in conferences and letters.  (Chief Counsel's Exhibit 4.)  These have been answered in the foregoing discussion.

Box 29-0274

E-528,529; NA-1039,1040    -21-

## Stonehill-Brooks Individual Cases

As previously stated, it is our opinion that the evidence is insufficient for us to concur in the recommendations for prosecution as set forth in the Stonehill-Brooks special agent's report.  One basic reason is that, as of this time, there appears to be very little prospect of obtaining witnesses who will adequately identify and interpret books and records of Stonehill, Brooks and their corporations and testify in the United States (or in the Philippines under the provisions of 18 U.S.C. 3491-3496). For an evaluation of this situation see the March 28, 1966, April 21, 1966 and April 22, 1966 memoranda from the revenue service representative, Manila. (Chief Counsel's Exhibit 5.)  Even should the Philippine Government eventually agree to cooperate in making N.B.I. witnesses available and not interfere in our efforts to obtain other Philippine witnesses, the problems in obtaining Philippine witnesses other than N.B.I. personnel would still exist, as indicated in the March 28, 1966 and April 22, 1966 memoranda, supra.

With reference to the lack of witnesses to identify and interpret books and records it is noted that in order to establish that records are made in the regular course of business (28 U.S.C. 1732), admissibility is not established merely by proving that the records were taken from the business or personal files of an individual or corporation.  Bisno v. United States, 299 F.2d 711, 718 (9th Cir. 1961) cert. denied 370 U.S. 952 (1962); National Labor Relations Board v. Sharples Chemicals, Inc., 209 F.2d 645, 653-654 (6th Cir. 1954).  There should be evidence to show that the record was made pursuant to established company procedures.  Standard Oil Company v. Moore, 251 F.2d 188, 215 (9th Cir. 1957) cert. denied 356 U.S. 975 (1958).

In the Stonehill-Brooks case many of the figures in both the net worth and specific items

Box 29-0275

E-528,529; NA-1039,1040    -22-

phases are based on Swiss bank records obtained in
the search and seizure; and typewritten and handwritten
analyses of the bank records, presumably prepared by
Stonehill or someone in his office.  (Cf. Stonehill-
Brooks Exhibits 82, 84, 86, 87, 88, 107, 109.)
Without witnesses to lay a proper foundation it does
not appear that they could be admitted as records
kept in the regular course of business.  Furthermore,
in order to establish that they might be admissible
on the grounds that they are admissions of Stonehill
and Brooks, witnesses other than the N.B.I. agents
would appear to be necessary in order to establish
the proper foundation.  United States v. Feinberg,
140 F.2d 592, 596 (2d Cir. 1944) cert. denied 322
U.S. 726 (1944); Standard Oil Company of California
v. Moore, supra, 251 F.2d 188, 217-218; and United
States v. Tellier, 255 F.2d 441, 448 (2d Cir. 1958)
cert. denied 358 U.S. 821 (1958).  As previously
noted (Chief Counsel's Exhibit 5) there are at present
apparently no witnesses who will give such foundation
testimony as to the documents seized in the raids.
In this connection, Karl Beck should be interviewed.
We will be guided by your wishes as to this interview,
and will coordinate the matter with representatives
of your Division.

    Since numerous documents contain notes which may
be in Stonehill's or Brooks' handwriting this may
be helpful in laying a foundation as to their admis-
sibility as admissions.  Bruce v. McClure, 220 F.2d
330, 336 (5th Cir. 1955).  We are making arrange-
ments for a handwriting expert to study some of these
items.  However, it is not expected that the problems
in proving the counts and figures recommended in the
July 30, 1965 special agent's report will be fully
resolved by using a handwriting expert.

Box 29-0276

There is no indication that witnesses will be
available from either Liechtenstein or Switzerland
to identify bank records or corporation records, etc.
In this connection, it is not expected that either
Doctor E. Michael Meyer or Mr. Albert Penet (Stone-
hill's and Brooks' accomplices in Switzerland) will
be available as witnesses.  On the issue of wilful-
ness and also on the issue of whether the Swiss
bank accounts are personal accounts of Stonehill
and Brooks, there is correspondence between Stonehill
and Meyer, and to a lesser extent, between Stonehill
and Penet.  (Cf. Stonehill-Brooks Exhibits 46, 48,
50, 51, 246, 254.)  It has been held that copies of
outgoing letters concerning the business can be
considered records made in the regular course of
business.  Bisno v. United States, supra, 299 F.2d
711, 718; Mahan v. Robertson, Limited, 133 F. Supp.
180, 188-189 (W.D. Ky. 1955); United States v.
United Shoe Machinery Corporation, 89 F. Supp.
349, 354 (D.C. Mass. 1950).  However, some courts
have held otherwise.  Nicola v. United States,
72 F.2d 780, 782-783 (3d Cir. 1934).  Cf. United
States v. National Construction Company, 155 F. Supp.
368, 370-371 (N.D. N.Y. 1957).

Again, although there may be some difficulty as
to admissibility of letters and records kept in the
regular course of business, if there are signatures or
handwritten notes on them as to which an expert can ren-
der an opinion, it is possible that they can be admitted
as admissions of either Stonehill or Brooks.  Also,
if there is a conspiracy count involving Stonehill,
Brooks and Blaustein (with Meyer and Penet as co-
conspirators but not defendants) some of these letters
may be admissible on the basis that they are acts
in furtherance of a conspiracy.  In Schine Chain
Theatres v. United States, 334 U.S. 110, 117 (1948)
interoffice letters and memoranda were held admissible
against all conspirators as declarations of some of

Box 29-0277

the associates so far as they were in furtherance
of the unlawful project. However, in spite of the ways,
mentioned above, some of the proposed evidence might
be admitted, it is our opinion that there would not
be sufficient admissible evidence at present for
prosecution as recommended in the Stonehill-Brooks
special agent's report.

Another factor, discussed in detail at pages
47-101 of the Memorandum of Fact and Law dated
March 4, 1966, is that it appears possible that a
Federal court may evaluate the N.B.I. search and
seizure de novo; hold that it was illegal (applying
United States standards); and determine that there
was sufficient participation by United States
personnel to warrant suppression of the evidence
obtained. (Cf. Judge Weinfeld's opinion, previously
mentioned.) However, it is recognized that this
is a matter which should be evaluated by a court.
See United States v. Granello, 17 AFTR 2d 707,
66-216 (PH) (S.D. N.Y. 1966) on the issue as to
whether Stonehill and Brooks have standing to complain
(since the raids were against corporations) if
illegally seized evidence is used against them as
individuals.

In addition to the lack of witnesses and the
difficulties concerning the admissibility of docu-
ments, there are other problems involved in the
proposed prosecution of Stonehill and Brooks as
recommended in the July 30, 1965 special agent's
report. With reference to the net worth case there
are starting point problems, particularly in view
of the worldwide operations of Stonehill and
Brooks and the difficulty of determining the existence
of all assets and liabilities. This is illustrated
by a recent request for collateral investigations,

Box 29-0278

some of which involved matters which may affect
the net worth analysis. (March 18, 1966 memo-
randum to Director, Intelligence Division,
Chief Counsel's Exhibit 6). Further, there
are technical items which make the net worth
case unattractive for criminal prosecution.
For example, funds (not recorded on the books
of United States Tobacco Corporation) held
by Universal for purchase of services, tobac-
co and supplies were considered in the Stone-
hill-Brooks special agent's report as con-
tributions by Stonehill and Brooks to capital
of the United States Tobacco Corporation.
Also, the evidence in support of the net worth
case is so voluminous it appears that a
specific items case would be more feasible
for criminal prosecution purposes in any event.

If the Philippine Government cooperates,
witnesses become available and it is deter-
mined that sufficient evidence is admissible
we would have no objection to prosecution of
Stonehill and Brooks for attempted evasion
of their individual income taxes based on
specific items of omitted income, and con-
spiracy. (Cf. Stonehill-Brooks SAR, pp.
132-222.) It appears, however, that the
case against Brooks would have somewhat
less jury appeal than the case against
Stonehill in view of the fact that during
his lifetime he appears to have spent only
about two years in the United States.

Box 29-0279

E-528,529;NA-1039,1040    -26-

Revenue Agent William Ragland has pre-
pared schedules and charts which help explain
the tobacco transactions arising in connection
with the barter agreement Stonehill had with
the Philippine Government.  (Chief Counsel's
Exhibit 7.)  A substantial portion of the
specific items is based on these transactions.
In addition, at our request and pursuant to
our guidelines Mr. Ragland has prepared
schedules setting forth the specific items
(and the understatements involved) which
appear to have the best potential for
criminal purposes in the event the evi-
dence becomes admissible.  (Chief Counsel's
Exhibit 8.)  These schedules do not include
all of the items recommended in the special
agent's report.  Representatives from
this office will be available to discuss
why some of the items recommended by the
special agent were not included in the
schedules.

Mr. Ragland has made analyses and
prepared schedules, based on the evidence
in the files, setting forth deposits in
Stonehill's Swiss bank accounts and dis-
bursements therefrom to various individuals;
and setting forth the distributions to various

Box 29-0280

individuals of the proceeds from tobacco sales,
commissions and freight rebates. (Chief Counsel's
Exhibit 3.) These schedules indicate that (in
the event there is ultimately prosecution) sub-
stantial adjustments will have to be made in some
of the items recommended in the Stonehill-Brooks
special agent's report. This results from the
fact that the special agent considered as income to
Stonehill and Brooks funds transferred to the Swiss
accounts. However, Mr. Ragland's analysis reveals
that subsequent disbursements were made from these
accounts to various individuals, thus requiring
adjustments in the special agent's recommended
specific items figures. In addition, during the
review in this office errors and inconsistencies
in the Stonehill-Brooks special agent's report have
been noted. This information will be made available
to representatives of your office. All of these
adjustments have been taken into consideration in
preparing the schedules as to the specific items
with the best criminal potential in the event the
evidence becomes admissible (Chief Counsel's Exhibit 8).

During the review in this office an attempt was
made to carve out a specific items case against
Stonehill and Brooks based on presently available
evidence which was not obtained in the raids and
which would not require witnesses from the Philip-
pines or Switzerland. Some of the items considered
in this connection were diversions of funds from the
sale of Philippine tobacco, which were credited in
1958 and 1959 to the personal accounts of Stonehill
and Brooks on the records of Universal New York,
Inc. Cf. Stonehill-Brooks SAR, pp. 4, 132-133 and
143-144. The evidence in support of these items is
included in Stonehill-Brooks Exhibit 244 (documents
and statements of witnesses obtained in the United
States) and Exhibit 245 (documents filed with the

Box 29-0281

Philippine Department of Commerce and Industry).
Exhibit 245 has been attested and certified as a
copy of official government records and, hence,
would be admissible without calling Philippine
witnesses.  (Section 1741, 28 U.S.C.; Rule 27,
Federal Rules of Criminal Procedure and Rule 44,
Federal Rules of Civil Procedure.)  Additional
specific items, provable without Philippine or Swiss
witnesses, are Stonehill's unreported dividends
from United States corporations in 1959, 1960 and
1961, credited to his account in the Baer Custodian
Corporation, a Swiss corporation doing business in New
York.  The evidence in support of these unreported
dividends is included in Stonehill-Brooks Exhibit 108
(records of Baer Custodian Corporation in New York).
In addition, Brooks did not report interest income
from various United States savings accounts on his
1958, 1959, 1960 and 1961 returns.  This can be
proved with records of the United States banks.

The amounts which can be proved as stated
in the foregoing paragraph are as follows:

### Stonehill

| | 1958 | 1959 | 1960 | 1961 |
|---|---|---|---|---|
| Sale of Tobacco | $18,587.04 | $45,510.75 | | |
| Dividends from U.S. Corporations | | 467.50 | $3,263.00 | $5,789.00 |
| Total | $18,587.04 | $45,978.25 | $3,263.00 | $5,789.00 |

Box 29-0282

E-528,529; NA-1039,1040    -29-

## Brooks

|  | 1958 | 1959 | 1960 | 1961 |
|---|---|---|---|---|
| Sale of Tobacco | $ 9,000.00 | $30,214.14 |  |  |
| Interest from Savings Accounts | 1,064.29 | 2,355.84 | $3,229.46 | $804.08 |
| Total | $10,064.29 | $32,569.98 | $3,229.46 | $804.08 |

The evidence in support of the sale of tobacco involved in the above understatements is discussed in the Stonehill-Brooks special agent's report at pages 139-140, 153-156, 200-201 and 204-206. See also charts in Chief Counsel's Exhibit 7 labelled First Shipment, Third and Fourth Shipment, Fifth Shipment and Sixth Shipment. Other documents relevant to these transactions are Chief Counsel's Exhibits 9, 10, 11 and 12.

Evidence to prove understatement of dividends from United States corporations, included in the above figures, is discussed in the Stonehill-Brooks special agent's report at pages 167, 172-173 and 183-185. See also Stonehill-Brooks Exhibit 108 and Chief Counsel's Exhibit 13.

Evidence in support of Brooks' unreported interest income is discussed at pages 201, 210-211, 213-214 and 221 of the Stonehill-Brooks special agent's report.

The special agent's report takes the position that Stonehill and Brooks "paid nothing" for the Philippine tobacco involved in the sales (Stonehill-Brooks SAR, p. 143). It appears that this cannot be adequately proved by available evidence. Additional

Box 29-0283

E-528,529; NA-1039,1040    -30-

investigation involving interviews with Philippine
cigarette manufacturers and further study of the
records of Stonehill's Philippine Tobacco Flue Curing
and Redrying Corporation might confirm the special
agent's position but the available evidence appears
insufficient.  Thus, since there is a cost problem
with reference to the tobacco sales (creating dif-
ficulty in proving a tax deficiency) consideration
was given to the use of Section 1001 of Title 18
rather than Section 7201 of the Internal Revenue
Code.  Consideration was also given to the use of
Section 7206(1) of the Code in view of a recent
decision to the effect that venue under Section
7206(1) is where the document is filed.  United
States v. Horwitz, 247 F. Supp. 412 (N.D. Ill. 1965).

Although not required in order to prove a viola-
tion of Section 1001 or Section 7206(1), in accordance
with our guidelines Mr. Ragland made computations to
determine the tax deficiencies which would result
from the understatements on the returns of Brooks and
Stonehill as set forth above.  (Chief Counsel's Exhibit
14.)  These computations revealed that either de minimus
or no tax deficiencies would be involved as to each
year.  Thus, in view of the magnitude of Stonehill's
and Brooks' operations on a worldwide basis as com-
pared with these omitted items, it appears that they
should not be the basis for criminal prosecution.

There will be problems in connection with making
available material under 18 U.S.C. 3500 in view of
numerous sensitive matters discussed in reports and
memoranda prepared by the agents.  Also, there are
some inconsistencies in the reports which defense
counsel may exploit.  For example, a revenue agent's
report which is an exhibit to the Stonehill-Brooks
special agent's report takes the position that the

Box 29-0284

E-528,529; NA-1039,1040          -31-

commissions and ocean freight differentials involved in the
Universal case were diversions from the Philippine Tobacco
Flue Curing and Redrying Corporation (a Philippine corpora-
tion) rather than from Universal. This is inconsistent with
the Universal as well as the Stonehill-Brooks special agent's
report. Although this can be explained on the basis that the
revenue agent did not have the benefit of all the evidence at
the time he drafted the report, this will create difficulties
if the report becomes available to the defense. In an effort
to prepare an objective appraisal of the Philippine situation,
Revenue Service Representative Powers has indicated that the
likely approach of that Government would be to treat the diver-
sions here in question as Philippine corporate evasion.
(Page 2 of one of the memoranda from Powers dated April 22,
1966 in Chief Counsel's Exhibit 2.) As admissions to Powers
do not form a part of this case, we feel that consideration
should be given to using the revenue agent on the technical
aspects so as to obviate Jencks problems.

It will be noted that a number of the exhibits to the
Stonehill-Brooks special agent's report are difficult to read.
This is to some extent the result of the fading of the prints
because of age. In addition, it is a result of difficulty in
obtaining good photographs of documents written with a light
ball point pen. We have available the microfilm of the docu-
ments so that new prints can be made, if desired. However,
with reference to the documents written too lightly, new
microfilm prints are not much of an improvement.

As indicated in the previous discussion there will be
substantial technical problems involved in successfully prose-
cuting Stonehill and Blaustein in connection with the Universal
phase of the case. We do not think these problems are in-
surmountable. However, assuming you are in agreement that
prosecution should be undertaken there are further factors
that should be considered. These factors are discussed
below.

Box 29-0285

As previously mentioned, a motion to suppress evidence has been filed in the bill of lading case, and the court has held that the defense is entitled to a hearing to determine whether United States agents participated in the claimed illegal searches to such an extent that they became in effect searches by the Federal Government, even though conducted beyond the territorial limits of the United States. This and related matters are discussed in the Memorandum of Fact and Law and the memorandum from Mr. McAleer dated March 9, 1966, *supra*. These problems may, to some extent, be resolved in the bill of lading case. However, it is expected that a motion to suppress will be made (and the problems will also arise) in the prosecution involving Universal as recommended herein. This is true since, as previously noted, the defense may attempt to show that the evidence in the Universal phase of the case is tainted as a result of the alleged illegal search and seizure in the Philippines. Even though the Government may ultimately prevail on any tainted evidence issue it appears that the defense will have the right to develop a number of sensitive matters in any hearing on this issue.

An example of one of these sensitive matters is the activity of Joseph McGee. It appears probable that a court would hold that the defense would be entitled to interrogate Mr. McGee. Thus, if executive privilege is claimed the court would probably not allow the Government to proceed with the case recommended herein. Cf. *Rovario v. United States*, 353 U.S. 53 (1957). In this connection, see pages 5-47 of the Memorandum of Fact and Law and pages 2-4 of the March 9, 1966 memorandum from Mr. McAleer, *supra*. Cf. pages 103-107 of the Memorandum of Fact and Law.

Another sensitive matter to be considered involves the so-called confidential payments to Philippine politicians. (Memorandum of Fact and Law, pp. 105-107; and memorandum from Mr. Powers dated April 21,

Box 29-0286

1966 in Chief Counsel's Exhibit 5.)  A May 3, 1966
classified memorandum from Mr. Powers referring to this
subject has been shown to representatives of your
Division and is available in the files of the Office
of International Operations.  It is apparent that
the Government cannot guarantee that the defense
will not attempt to use evidence of these payments
in the Universal case in some manner, no matter how
unrelated and remote from the case such payments
might be.  Since your Division is still negotiating
with the State Department on this matter we are not
able to fully evaluate its effect on the decision as
to whether there should be prosecution as recommended
herein.  Of course, the matters discussed in this and
the preceding paragraph would be even more relevant to
consider in connection with any ultimate decision
regarding prosecution of Stonehill and Brooks as to
their individual taxes.

Action in connection with the civil liabilities
in the Stonehill-Brooks case has been previously dis-
cussed.  With reference to Universal New York, Inc.,
no part of the civil liability has been assessed or
paid, nor has any statutory notice of deficiency
been issued.  Pending disposition of the criminal
proceedings, the Internal Revenue Service will be
guided by the wishes of the Attorney General with
respect to the civil liabilities.

During the time these cases have been under
review in this office numerous supplemental memoranda
have been received.  These are enclosed in Chief
Counsel's Exhibit 15 and are listed by date below.
Where an asterisk appears in the list the exhibits
referred to in the memoranda are not enclosed but will
be available among the workpapers and other materials
being held by the agents.  The memoranda are as
follows:  September 10, 1965; November 17, 1965;

Box 29-0287

E-528,529; NA-1039,1040    -34-

November 18, 1965*; December 23, 1965; December 28,
1965*; two memoranda dated December 29, 1965*; Feb-
ruary 1, 1966*; February 7, 1966; February 14, 1966;
February 16, 1966; February 25, 1966; February 28,
1966*; two memoranda dated March 7, 1966; March 16,
1966; March 23, 1966; March 25, 1966; March 29, 1966;
two memoranda dated April 1, 1966; April 4, 1966;
April 14, 1966*; April 15, 1966; April 21, 1966;
April 26, 1966; April 28, 1966; and April 29, 1966.
There is also a classified memorandum from Mr. Powers
dated January 31, 1966, not included in the above
list and not enclosed. This memorandum transmitted
copies of the materials made available by the informant,
Menhart Spielman. The memorandum and its enclosures
will be available when needed.

The following documents are transmitted herewith:
(1) two copies of memorandum from Intelligence Division,
dated October 22, 1965, pertaining to the Stonehill-
Brooks case, together with Exhibits 1 through 9;
(2) the original and one copy of the special agent's
report pertaining to Stonehill and Brooks dated
July 30, 1965, prepared by Revenue Service Representa-
tive Sterling Powers, together with Exhibits 1 through
260; (3) the original and one copy of the report of
Special Agent Herbert Ravett dated May 28, 1965
pertaining to Universal New York, Inc., Ira Blaustein,
and Harry Stonehill, together with Exhibits 1 through
233; (4) one copy of the report of Revenue Agent
William C. Ragland dated December 10, 1964 pertaining
to the Stonehill-Brooks case; (5) Chief Counsel's memoranda
previously mentioned; and (6) five copies of this
letter.

Please return the original reports, together
with the exhibits, to this office after they have
served their purpose.

Box 29-0288

E-528,529; NA-1039,1040    -35-

After careful consideration, we are convinced that the evidence relied upon to support the recommended prosecution is sufficient to indicate guilt beyond a reasonable doubt and that there appears to be a reasonable probability of conviction.

In view of the sensitive nature of this matter, we have confined the distribution of this letter to your office and to the Criminal Division. We are, therefore, enclosing two extra copies for the United States Attorney, Southern District of New York, at such time as you deem appropriate.

The proposed prosecution is duly authorized. As you are aware, there has been continuous coordination concerning the criminal and civil phases of this matter with representatives of your Division. In this regard, the coordinated assistance of the Service will continue to be furnished.

Please advise this office as to the action taken or disposition made in this matter.

Very truly yours,

(Signed) Lester R. Uretz

(Init.) WBM

Lester R. Uretz
Chief Counsel

Enclosures:
  As stated

1 cc Assistant Attorney General, Criminal Division, Department of Justice
2 cc Collection Litigation Division
2 cc Tax Court Division
2 cc Director, Intelligence Division
2 cc Director, Office of International Operations

HMHuckabee/sle
5/17/66                              Box 29-0289